

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36582-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD JAMES ROBERTS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — A jury found Richard Roberts guilty of felony harassment of another (threat to kill), based on an angry call made to a hospital in which Mr. Roberts threatened to kill hospital workers and blow up the hospital. Mr. Roberts argues on appeal that the State committed prosecutorial misconduct in closing argument by mentioning facts outside the evidence and vouching for its chief witness. Finding no misconduct, we affirm.

FACTS AND PROCEDURAL BACKGROUND

At around 10:00 p.m. on October 18, 2017, Richard Roberts placed a telephone call to the Astria Regional Medical Center after receiving a call from Tammy Chadek, his significant other, who was then a patient at the hospital. She told Mr. Roberts she had been questioned rudely by a doctor and wanted Mr. Roberts to pick her up and take her

home.  Mr. Roberts did not have a car.  According to Ms. Chadek, the call ended when she hung up on him.

Mr. Roberts then called the hospital and spoke with Adam Frankovic, the nursing supervisor and the acting administrator that evening.  Mr. Frankovic would later testify that Mr. Roberts

> was looking for the doctor who was consulting with the patient in [room] 447.  I explained that I was not the doctor but I was a nursing supervisor. He had a complaint.  I said, I can help you try and figure this out.  After that, he went into yelling and screaming, threatening to, and I quote, blow the fucking doctor's head off and shoot up the hospital.

Report of Proceedings (RP) at 216.  Asked about any specific threats made by Mr. Roberts, Mr. Frankovic would later testify, "He also said that he was going to come shoot up the hospital, blow it up and kill me and blow my head off as well." *Id.*

Mr. Frankovic took Mr. Roberts's threats seriously, and told Mr. Roberts he was contacting the Yakima Police Department.  After hanging up on Mr. Roberts, Mr. Frankovic placed the hospital in lockdown and hospital security contacted police.

After the hospital had been placed in lockdown, Mr. Roberts called a second time. Mr. Roberts's second call was answered by Pam Hunter, a monitor tech, who spoke with Mr. Roberts briefly before handing the phone to Mr. Frankovic.  According to an affidavit of probable cause prepared by a responding Yakima police officer, Ms. Hunter told him Mr. Roberts "seemed very agitated over the phone and made a statement similar to 'I'm going to blow you all up.'"  Clerk's Papers (CP) at 2.

2

Mr. Frankovic later testified that after Ms. Hunter handed the phone to him, Mr. Roberts "again went into a tirade that he's coming to shoot us up, blow us up, blow my head off." RP at 244. Mr. Frankovic told Mr. Roberts the police had been contacted and Mr. Roberts was not allowed on hospital premises.

After Yakima police officers responded to the hospital, one of the officers spoke to Mr. Roberts by phone. Mr. Roberts told the officer he had no firearms and did not plan to harm anyone. Officers then traveled to his home, where they placed him under arrest. When arrested, Mr. Roberts was upset and yelling, saying he had done nothing wrong. He admitted that in his calls to the hospital he had threatened to "get their heads," but claimed he meant only to "get their jobs taken away." RP at 274.

The State charged Mr. Roberts with two counts of felony harassment of another (threat to kill). Count 1 pertained to the threats to Mr. Frankovic and count 2 pertained to the threats to Ms. Hunter.

On the morning of trial, the prosecutor explained that he would be dismissing the count pertaining to Ms. Hunter. He told the court that the day before, Ms. Hunter had faxed a note from her doctor that testifying would be too stressful for her. Defense counsel asked that Ms. Hunter be excluded entirely as a witness, since the defense had been attempting to make contact with her for 16 months without success. The State affirmed it would not call Ms. Hunter as a witness but said, "[i]t might be a good idea to

mention that name to the jury just in case someone knows her. Her name will probably come up in the trial." RP at 28. Defense counsel agreed.

Mr. Frankovic was called as the State's first witness. He testified that he feared Mr. Roberts's threats would be carried out because of "the tone of his voice, very angry, yelling, screaming to the point I couldn't get in words to help calm him down." RP at 217. During cross-examination, defense counsel asked how many calls he had received, and Mr. Frankovic responded,

A.   There was one that I took, and there was another one made to the telemetry floor.

Q.   Just for you, how many phone calls did you take?

A.   One. I spoke to him twice. The initial one was from the operator to me. Then the next one he had called the floor and I was handed the phone.

RP at 235. Asked further about the second call in redirect examination, Mr. Frankovic said:

So on the second call, when I got up to the ACU unit after putting the hospital on lockdown, I was handed a phone. It went from Pam, who's the monitor tech to the ACU charge nurse, who didn't say anything and handed it to me. I asked who it was. They said that it was the significant other of 447 again.

RP at 244.

The prosecutor brought up Ms. Hunter's name one more time in redirect examination, asking Mr. Frankovic if she had stress issues. An objection that the question was outside the scope of cross-examination was sustained. Outside the presence

4

of the jury, the prosecutor explained he was concerned the defense would imply that Ms. Hunter's evidence must be unhelpful to the State or it would have called her as a witness. He said he might recall Mr. Frankovic to explain that Ms. Hunter experienced medical issues from stress, "by way of an explanation as to why this witness is not testifying." RP at 302. The concern was resolved by defense counsel's agreement that he never intended to make a missing witness argument and, "I'm not going there." RP at 305.

In the defense case, Mr. Roberts called as witnesses Ms. Chadek and a friend, Marie Holestine, who testified that she had been sitting with Mr. Roberts in his living room when he called the hospital. She testified that the phone was on speaker, and she heard the conversation. She testified that Mr. Roberts's only threat to the hospital workers was to "have their jobs taken." RP at 324. She acknowledged that Mr. Roberts was upset and pacing during the calls.

When cross-examined, Ms. Holestine admitted that when Mr. Roberts was arrested she was questioned by police and told them she had not paid much attention to Mr. Roberts's calls and only heard parts of them. Explaining the discrepancy, she said she lied to the officer at that time because she did not want to get involved.

Mr. Roberts did not testify.

The overarching theme of the State's closing argument was that if jurors believed Mr. Frankovic's testimony, then all of the elements the State was required to prove were satisfied. The prosecutor then argued reasons why jurors should believe Mr. Frankovic.

In the course of arguing why it was not reasonable to suggest that Mr. Frankovic was mistaken about Mr. Roberts's threats, the prosecutor told jurors:

> He was very specific in the language he quoted. *His assistant had received those threats.* I would imagine those words would be burned into memory, not something he would be likely to forget as much as he might like to.

RP at 384-85 (emphasis added). The defense did not object to this argument, nor did it ever object that the prosecutor was vouching for any State witness.

In the defense closing argument, Mr. Roberts's counsel challenged Mr. Frankovic's testimony. He agreed that "[i]t all comes down to credibility." RP at 401.

The jury found Mr. Roberts guilty. He appeals.

ANALYSIS

Mr. Roberts contends the prosecutor committed misconduct during closing argument by referring to threats having been made to Ms. Hunter, a fact not in evidence, and by vouching for Mr. Frankovic's credibility.

Prosecutorial misconduct is not attorney misconduct in the sense of violating rules of professional conduct. *State v. Fisher*, 165 Wn.2d 727, 740 n.1, 202 P.3d 937 (2009). It is, instead, a term of art that refers to "prosecutorial mistakes or actions [that] are not harmless and deny a defendant [a] fair trial." *Id.* To succeed on a prosecutorial misconduct claim, an appellant has the burden of establishing that the prosecutor's

6

conduct was improper (as being at least mistaken) and was prejudicial. *State v. Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997).

Where, as here, a defendant fails to object in the trial court to a prosecutor's statements, he waives his right to raise a challenge on appeal unless the remark was so flagrant and ill-intentioned that it evinced an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *Id.* at 719. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *State v. Emery*, 174 Wn.2d 741, 761, 278 P.3d 653 (2012) (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

"In the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" *Fisher*, 165 Wn.2d at 747 (quoting *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014)). Alleged improper comments are reviewed in the context of the argument as a whole. *Id.*

*Reference to facts not in evidence*

During closing arguments, it is improper for a prosecutor to make statements or submit facts to the jury that are not supported by the evidence. *In re Pers. Restraint of*

7

*Glasmann*, 175 Wn.2d 696, 705-06, 286 P.3d 673 (2012). Evidence was presented during trial that Ms. Hunter had answered Mr. Roberts's second call and handed the phone to Mr. Frankovic. Because the State dismissed the harassment charge pertaining to her, however, no evidence was offered during the trial that she was threatened during her short time on the call.

The jurors had received the pattern closing instruction, which includes the following admonition:

> The lawyers' remarks, statements and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement or argument that is not supported by the evidence or the law in my instructions.

RP at 375.

If defense counsel had objected when the prosecutor referred to an assistant receiving threats, the court would have reminded the jurors that the lawyers' arguments were not evidence, which would have been sufficient to cure any prejudice. Prejudice was unlikely in any event, because any threat received by Ms. Hunter was irrelevant to the only charge being decided by the jury. Indeed, because jurors heard nothing about any threat made personally to Ms. Hunter, they might have construed "[h]is assistant had received those threats," RP at 384, as referring to the fact that the threats *to Mr. Frankovic* were not only to blow his head off, but to shoot up and blow up the hospital.

*Vouching*

Turning to the contention that the prosecutor vouched for Mr. Frankovic's credibility, it is improper for a prosecutor to personally vouch for or against a witness's credibility. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). "Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). "Prosecutors may, however, argue an inference from the evidence, and prejudicial error will not be found unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." *Brett*, 126 Wn.2d at 175 (quoting *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)).

Mr. Roberts points to four statements made by the prosecutor. Three were made during the initial closing argument, after the prosecutor—as his "starting point"—asked jurors to think about "[w]hat are the reasonable explanations why Mr. Frankovic would call the Yakima Police Department and state he got a phone call from this gentleman" and relate the alleged threats? RP at 384. The first three challenged statements are:

> Why would he take the stand and testify under oath that that's what Mr. Roberts said to him back on September 18th, 2017?
> . . . .
> . . . Was he intentionally not telling the truth when he called the police department that evening when he came up and testified under oath? . . .
> . . . .

9

. . . I can't understand why he would say those things unless they
were true is what I'm arguing to you.

RP at 384-86.

None of these rhetorical questions or statements constitutes vouching. In the case
of the third, the prosecutor could have better avoided argument that he was stating a
personal opinion by dropping the introductory "*I* can't understand" and making the
equivalent argument, "Why would he say those things unless they were true?" In each
case, however, the prosecutor was suggesting that jurors should draw the inference, from
evidence, that Mr. Frankovic had no motive to do anything other than tell the truth.

The fourth challenged statement was made during rebuttal argument:

What makes a lot of sense and he was telling the truth. He didn't
have a motive not to tell the truth.

RP at 406. The first sentence is not only ungrammatical, but it does not make sense in
context. Whether misspoken or mistranscribed, it appears likely that "and" should be
"is":

Is there a reason to believe Mr. Frankovic? You have to look at him
and observe his demeanor. We'll talk about what the law tells you about
witness credibility in a moment. Does he seem like the kind of person to do
that?
He's got a responsible job. He's basically administrator of the
whole hospital. He's in a profession of being a nurse. I would suggest
those two explanations just don't make sense.
*What makes a lot of sense* [*is*] *he was telling the truth.* He didn't
have a motive not to tell the truth. Of course, Mr. Roberts did have a
motive.

No. 36582-4-III
*State v. Roberts*

*Id.* (emphasis added). Thus understood, the prosecutor was, once again, asking jurors to infer from evidence (Mr. Frankovic's demeanor, his job, his profession) that Mr. Frankovic was being honest. Even without this suggested interpretation of the prosecutor's argument, Mr. Roberts fails to demonstrate "clearly and unmistakably" that the prosecutor was expressing a personal opinion.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, C.J.

11